J-A18031-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| LOUIS HAYES | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ALANA SANTORO | : | No. 98 WDA 2024 |

Appeal from the Order Entered January 2, 2024
In the Court of Common Pleas of Allegheny County
Family Court at FD 14-001546-017

BEFORE:  OLSON, J., MURRAY, J., and BENDER, P.J.E.

MEMORANDUM BY BENDER, P.J.E.:          **FILED: September 5, 2024**

Louis Hayes (Father) appeals from the order denying his petition seeking primary custody of the daughter (Child) he shares with Alana Santoro (Mother).  We affirm.

Child was born in June 2012.  Prior to this action, the parties shared legal and physical custody of Child, "with physical custody following a 4-3-3-4 shared custody schedule."  Trial Court Opinion (TCO), 3/27/24, at 3.  The trial court "found it … noteworthy that the parties live within proximity to each other — no more than 15-minutes of driving time."  *Id.* at 4.  Father lives with his fiancé and their young child.  N.T., 7/31/23, at 130.  Mother lives with her husband and their young child, as well as Mother's 17-year-old daughter.  *Id.* at 416, 419.

On March 31, 2022, Father petitioned for primary physical custody of Child and sole legal custody for matters involving Child's education.  The

parties participated in court-ordered evaluations and appeared before the trial court for a conciliation on February 27, 2023. The trial court subsequently scheduled the matter for a two-day trial on July 20-21, 2023. Order, 3/1/23, at 1. In addition, the court ordered the parties to "resume Co-Parenting Therapy with the same therapist who had provided the therapy in the past. This should resume as soon as possible, since it is the [c]ourt's reasoned opinion that such services are very much needed and required." ***Id.***

The trial court held the trial as scheduled on July 20-21, 2023. By order entered January 2, 2024, the trial court denied Father's petition. The order included the following directives:

> As per prior Order, the parties are mandated to attend co-parenting therapy.
>
> The parties shall continue to share physical custody on a 4-3-3-4 custody schedule with the status quo of that schedule continuing. The parties shall continue to follow the provisions of the April 7, 2021 Consent Order, particularly as to [Father's] "right of first refusal."
>
> The parties shall continue to share legal custody.
>
> This [c]ourt is not entering a more detailed parenting plan at this juncture because of a lack of information from the parties on what details should or should not [be] included in such a plan. Should the parties wish to have more specificity, the [c]ourt will entertain proposals in conformance with the [c]ourt's Memorandum Opinion. However, the [c]ourt's preference would be for the parties to attempt to first reach a consensus, and then to address any disagreements in co-parenting therapy.

Order, 1/2/24, at 1.

Father timely appealed on January 17, 2024. ***See Wagner v. Wagner***, 887 A.2d 282, 285 (Pa. Super. 2005) ("[A] custody order that anticipates

future hearings that could take place on application of one of the parties is a final, appealable order.") (emphasis and citation omitted). With his appeal, Father filed a concise statement of errors pursuant to Pa.R.A.P. 1925(a)(2)(i). The trial court filed an opinion stating:

> [The trial court] concluded, following two (2) days of trial, that it was in the best interest of [C]hild to continue to spend equal custody time with Mother [and that] Mother remain[] involved in [Child's] schooling. [The trial court] predicated [the] decision, in part, upon a judicial interview with the Child and her older sister, [], as well as consideration of the testimony of twelve other witnesses.

TCO at 2.

Father presents the following eight questions for review:

I. Did the trial court commit an abuse of discretion and/or error of law by failing to give proper weight and consideration to the facts presented by expert and law [*sic*] witnesses to the custody factors[?]

II. Did the trial court commit an abuse of discretion and/or error of law by failing to give proper weight and consideration to which parent was more likely to attend to the daily physical, emotional, developmental, educational and special needs of the Child in determining this factor as neutral[?]

III. Did the trial court commit an abuse of discretion and/or error of law by failing to give proper weight and consideration to which parent was more likely to maintain a loving, stable, consistent and nurturing relationship with the Child adequate to the Child's emotional needs in determining this factor as neutral[?]

IV. Did the trial court commit an abuse of discretion and/or error of law by failing to give proper weight and consideration to the level of conflict between the parties and the willingness and ability of the parties to cooperate with one another in determining this factor as neutral[?]

V. Did the trial court commit an abuse of discretion and/or error of law in determining that the Child's life would not be enhanced by allowing Father to have primary custody[?]

VI. Did the trial court commit an abuse of discretion and/or error of law by failing to give proper weight and consideration to the history of drug and alcohol abuse of a party or member of the party's household in determining this factor as neutral[?]

VII. Did the trial court commit an abuse of discretion and/or error of law by failing to give proper weight and consideration to the report and testimony of Dr. Chambers[,] the court appointed expert[,] recommending primary physical custody to Father[?]

VIII. Did the trial court commit an abuse of discretion and/or error of law by failing to give proper weight and consideration to the witness testimony in determining the testimony as neutral and against the weight of the evidence presented[?]

Father's Brief at 5-7 (unnecessary capitalization omitted).

Legal Authority

In reviewing a custody order, "our scope is of the broadest type and our standard is abuse of discretion." **White v. Malecki**, 296 A.3d 1210, 1213 (Pa. Super. 2023) (citation omitted). We have explained:

This [C]ourt will not find an abuse of discretion "merely because a reviewing court would have reached a different conclusion." **In re K.D.**, 144 A.3d 145, 151 (Pa. Super. 2016). This Court must accept the findings of the trial court that the evidence supports. **S.W.D.**[ **v. S.A.R.**], 96 A.3d [396,] 400 [(Pa. Super. 2014)]. Importantly, "[o]n issues of credibility and weight of the evidence, we defer to the findings of the trial judge who has had the opportunity to observe the proceedings and demeanor of the witnesses." **K.T. v. L.S.**, 118 A.3d 1136, 1159 (Pa. Super. 2015) (citation omitted). We can interfere only where the "custody order is manifestly unreasonable as shown by the evidence of record." **Saintz v. Rinker**, 902 A.2d 509, 512 (Pa. Super. 2006) (citation omitted). Further, in a custody case, relief is not warranted unless the party claiming error suffered prejudice from the mistake. **J.C. v. K.C.**, 179 A.3d 1124, 1129-30 (Pa. Super. 2018).

- 4 -

The Custody Act requires a trial court to consider all of the Section 5328(a) custody factors when "ordering any form of custody," and further requires the court to give "weighted consideration to those factors which affect the safety of the child[.]" 23 Pa.C.S. § 5328(a). A trial court must "delineate the reasons for its decision when making an award of custody either on the record or in a written opinion." *S.W.D.*, 96 A.3d at 401. *See also* 23 Pa.C.S. § 5323(a) and (d). However, "there is no required amount of detail for the trial court's explanation; all that is required is that the enumerated factors are considered and that the custody decision is based on those considerations." *M.J.M. v. M.L.G.*, 63 A.3d 331, 336 (Pa. Super. 2013).

[O]ur paramount concern is the best interests of the child. *See Saintz*, 902 A.2d at 512 (explaining that this Court's "paramount concern and the polestar of our analysis" in custody cases is the best interests of the child) (citation omitted). "The best-interests standard, decided on a case-by-case basis, considers all factors which legitimately have an effect upon the child's physical, intellectual, moral, and spiritual well-being." *D.K.D. v. A.L.C.*, 141 A.3d 566, 572 (Pa. Super. 2016) (citations omitted). "Common sense dictates that trial courts should strive, all other things being equal, to assure that a child maintains a healthy relationship with both of his or her parents, and that the parents work together to raise their child." *S.C.B. v. J.S.B.*, 218 A.3d 905, 916 (Pa. Super. 2019).

*Bleam v. Wynne*, No. 2618 EDA 2022, unpublished memorandum at 4-6 (Pa. Super. filed Oct. 25, 2023).[1]

Father's issues all relate to the trial court's consideration and weighing of the evidence. *See* TCO at 9 (trial court stating, "In the eight (8) paragraphs of his 1925(b) Statement, Father alleges [the trial court] failed to properly weigh and apply the statutory custody factors of 23 Pa.[]C.S. §5328"). Thus, we reiterate that "[o]n issues of credibility and weight of the evidence, we

---

[1] Superior Court non-precedential decisions filed after May 1, 2019 may be cited for persuasive value. Pa.R.A.P. 126(b)(2).

- 5 -

defer to the findings of the trial judge who has had the opportunity to observe the proceedings and demeanor of the witnesses." **K.T.**, 118 A.2d at 1159 (citation omitted).

Here, the trial court "found the witnesses relied [upon] by Father to be biased against Mother." TCO at 6. The trial court also "found that Father largely sought to portray only his good qualities as a parent, while negatively portraying Mother and attempting to negate her real, valuable role in the Child's life which furthers the Child's development and well-being." **Id.** at 9. With respect to Mother, the trial court "found Mother to be credible and willing to take responsibility for many of the problems identified by Father during trial." **Id.** at 7.

The trial court explained:

Overall, through the course of a two-day trial, I listened to the testimony of more than a dozen witnesses, and I carefully deliberated over all the information that they imparted. I also reviewed each item of evidence presented to me. I allowed both sides largely to present their case without interruption. Everything that I did was to attempt to determine the best interests of [Child], keeping in mind that I was probably not seeing either party "on their best days" and that I was receiving only select information about matters that occurred over many years. Having appropriately weighed and considered the evidence, I did not believe it mandated that I award Father [p]rimary [p]hysical [c]ustody and [s]ole [l]egal [c]ustody for purposes of educational decisions. Though Father disagrees with that conclusion, it was reached largely upon my credibility assessment of the evidence and witnesses before me. I did not make these decisions arbitrarily, capriciously, or out of ill-will or animus toward Father; indeed, I find Father to be an overwhelmingly positive factor in the Child's life, but not such that it supports removing the Child from Mother.

*Id.* at 8-9.

Our review of Father's issues and arguments provides no basis for disturbing the trial court's order. The trial court's findings are based on competent evidence contained in the record and its conclusions are not unreasonable. Upon consideration of the record and law, we adopt the well-reasoned opinion entered by the Honorable Chelsa Wagner of the Court of Common Pleas of Allegheny County on March 27, 2024. Judge Wagner's opinion properly disposes of Appellant's issues. Accordingly, we affirm the order denying Father's petition to modify custody.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

9/5/2024

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA
FAMILY DIVISION

LOUIS HAYES,

                Plaintiff,

    v.

ALANA SANTORO

                Defendant.

No.: FD-14-0001547
Sup. Court No: 98 WDA 2024

## OPINION

March 26, 2024                                       Judge Chelsa Wagner

Father, Louis Hayes ("Father") has appealed from my December 27, 2023 Custody Order denying his request for Primary Custody and Sole Legal Custody for educational matters over the parties' child, A.H. ( born in June 2012 ), age 12 ("Child"). Instead, I concluded, following two (2) days of trial, that it was in the best interest of the child to continue to spend equal custody time with Mother, Alana Santoro ("Mother") and Mother remained involved in A.H.'s schooling. I predicated my decision, in part, upon a judicial interview with the Child and her older sister, T.L., as well as consideration of the testimony of twelve other witnesses. Because my Order was within my discretion and is in Child's best interest, it should be affirmed.

## BACKGROUND

The factual milieu of this case is accentuated by the parties' tumultuous relationship that seemingly started from the beginning. Allegations of drug and alcohol use as well as violent, abusive behavior have been raised and were discussed by both parties at trial. The docket in this matter accurately reflects the litigiousness of the parties and their inability to agree on much, if anything, concerning A.H.

2

Father filed a custody modification on January 19, 2021. As of the date of this trial, the parties shared legal custody and physical custody of the minor child with physical custody following a 4-3-3-4 shared custody schedule.

In his petition, Father sought Primary Physical Custody of A.H. as well as Sole Legal Custody for purposes of educational decision making. Father asserts that Mother has not historically been appropriately engaged with A.H.'s education, does not take educational/academic matters with the level of seriousness they merit, particularly considering A.H.'s specific needs, and does not make herself available to assist A.H. with homework and school related projects. With respect to A.H.'s education, there appeared to the Court to be a level of animosity and non-cooperativeness between Mother and A.H.'s tutor, Adrienne Baker (N.T. 52-96), which is certainly not something one encounters in the usual "tutor-parent relationship." Curiously to this Court's view, the tutor, Ms. Baker, played an outsize role at trial, testifying at length on behalf Father, with Father positing her as an integral witness to his custody case, even though, at best, Ms. Baker, as a tutor interacted with the child no more than once per week for a few hours per session. (N.T. 111). As to educational matters, I also heard from one of A.H.'s teachers, Christina Bodo (N.T. 45-50). The issues identified as issues by Father and the tutor were not supported by Ms. Bodo nor by A.H.'s school records.

As to physical custody, Father presented evidence supporting his view that Mother's household is chaotic, unpredictable, and fueled by rampant alcohol use, pointing back to multiple incidents spanning several years to show that Mother's use of alcohol, social life, and choice of friends, continually places A.H. in inappropriate and dangerous situations. Father contends that Mother has, on several occasions, abandoned A.H. without supervision, which has resulted in A.H. contacting Father to pick her up. Along these lines, Father notes that the parties' custody order contains provisions concerning alcohol use, appropriate caregivers for A.H., and a "right of first refusal" to allow Father to exercise custody when Mother is not available. Father claims, again with reference to several episodes recounted during the trial, that Mother routinely disregards these provisions. These issues have served as flashpoints of conflict between the parties, resulting in PFA filings, motions, calls to the police, and general rancor, none of which is in the best interests of A.H.

The parties have very different households. Father lives with his wife, Emily Passarell, and their young child. Mother resides with her husband, Thomas Santoro, their two, younger

3

children, as well as Mother's older daughter from a prior relationship, T.L., and (from time to time) Mr. Santoro's older son, W.S. Additionally, Mother has had extended family living with her for months at a time. Undoubtedly, there exists the potential for more volatility in Mother's household, just given the numerosity of the involved persons dwelling inside of her walls. The question faced by this Court, however, was whether the alleged volatility and its consequences was contrary to the best interests of A.H. such that it required Father to exercise Primary Custody and supported removing Mother from any involvement in school matters.

This Court also found it to be noteworthy that the parties live within proximity to each other – no more than 15-minutes of driving time. Therefore, even if Father had prevailed, by no means would the problems identified by Father with Mother and her household have gone away, and A.H. would have continued to interact with Mother and her other family members on a reduced basis, albeit with one that left Mother with no involvement in A.H.'s educational life. For this reason, as well as others that I enumerate in my detailed Memorandum Opinion from December 27, 2023, I did not deem Father's proposed parenting plan to offer a path forward to the family that stood in the best interest of A.H. nor a solution to the issues about which Father consistently complains. Instead, I believed then, and continue to believe now, that the most reasonable solution remains for the parties to engage in committed co-parenting counseling, to improve their communication, and to remove themselves from a litigious posture which has encouraged them to live their lives "collecting evidence" against one another for purposes of future custody proceedings.

## ERRORS ASSERTED BY FATHER ON APPEAL

Father timely filed a Notice of Appeal in which he claims that my December 27, 2023 Memorandum Opinion and Order erred in the following respects.

1. I failed to give appropriate weight and consideration to the facts and evidence presented by the expert and lay witnesses as to the Custody Factors.

2. I failed to give appropriate weight and consideration to which parent was more likely to attend to the daily physical, emotional and other needs of the Child as required by Custody Factor # 10. I instead found that Custody Factor to be "neutral" as to both parties.

4

3. I failed to give appropriate weight and consideration to the facts and evidence presented with respect to Custody Factor # 9 concerning loving, stable, and nurturing relationships, which I concluded to be "neutral" as between the parties.

4. I failed to give appropriate weight and consideration to the level of conflict between the parties pursuant to Custody Factor # 13, which I concluded to be "neutral."

5. I erred by concluding that the Child's life would not be enhanced by allowing Father to exercise Primary Custody.

6. I erred by failing to properly consider and give weight to the history of drug and alcohol abuse in Mother's household by finding this factor to be "neutral" under Custody Factor #14.

7. I erred by failing to give appropriate weight and credibility to the expert opinion of Dr. Bruce Chambers, who opined that Father should exercise Primary Custody. Indeed, I disregarded the opinions of Dr. Chambers.

8. I erred by failing to give proper weight and consideration to the witness testimony.

Discussion

I will address Father's assertions of error generally below. But I note at the outset that, while I found both parents to be competent and committed parents who both want the best for Child, my role is to determine what is in the best interest of the Child, not the parents. Nor is it my role to award custody based on a scorekeeping method as to what occurred in the past, by tallying up the number of errors or missteps committed by a parent. Instead, in determining the best interests of a child, I am charged with the heavy responsibility of looking forward, considering the impact upon the Child of what one of the parents wants to occur, and whether the consequences of that decision will be in the Child's best interest. It is in this respect that I found the testimony of Father and his witnesses to be most deficient. Father kept revisiting a select number of incidents that portrayed Mother in a negative light, in some instances, deservedly so. However, Father neglected to address the impact that his requested change of custody would have upon the Child, including upon her relationships with her siblings remaining in Mother's household. Father's case struck me as retrospective in nature, as well as punitive to the extent that it sought to "take away" custody from Mother based upon past conduct without appropriate consideration of the impact that would have upon Child.

To this extent, I found the testimony and the "opinion" of Dr. Chambers to be emblematic. Dr. Chambers was appointed as an expert to opine on a custody recommendation that was in the

5

best interests of the Child. Yet, Dr. Chambers "opinion" amounted largely to a regurgitation of facts presented to this Court by other witnesses testifying on behalf of Father. Dr. Chambers failed to discuss or opine on the impact his custody recommendations would necessarily have upon the Child, including how she would process and deal with seeing her Mother and other siblings less often and how she would experience her Father making all of her educational decisions without Mother's involvement. The Court solicits expert opinions to guide it on these very sorts of delicate issues that our outside the ken of the average jurist, not to provide an independent adjudication of the "facts," for which task the Court is quite capable. Perhaps one reason for this omission by Dr. Chambers is that he did not offer any testimony to his experience of seeing children as patients in a therapeutic or clinical setting. Instead, this Court gathered that Dr. Chambers is a professional expert witness who is summarily unable to comment upon the impact that his recommendations have upon children. Thus, for these reasons alone, this Court properly considered and then disregarded the recommendations of Dr Chambers, although he served as a the "court-appointed expert" in his case. If this Court is going to adopt the recommendations of an expert such as Dr. Chambers, it is at least entitled to have some qualified predictive opinions and guidance as to how those recommendations will impact the Child moving forward. Without that, the undersigned believes it would have been irresponsible to have adopted Dr. Chambers' recommendations merely because he made them.

Clearly, these parties have historically had a very difficult time co-parenting the Child due to their inability to properly communicate with each other. Fault for this lack of communication lies with both parties. However, limiting Mother's role in the Child's education and removing a day or two each week from Mother would not have served as a panacea. Granting Father what he wanted would not have remedied the fact that the parties still need to get along, cooperating for the best interest of the Child. Indeed, when I interviewed the Child, she said as much. I found the Child to be credible, intelligent, and honest. I found that A.H. loved and cared for both of her parents, wants to spend time with them both, and feels good when she is under their care. (N.T. 5-7, 11-12, 30-32). From that interview with the Child, I did not determine that the Child's best interests would be served by allowing Father to exercise Primary Custody,

As to credibility, I found the witnesses relied by Father to be biased against Mother. While Dr. Chambers interviewed the tutor and Mr. Santoro's ex-wife, he failed to act upon Mother's

6

request that he contact A.H.'s therapist, A.H.'s siblings, A.H.'s teachers or the parties' co-parenting therapist, Dr. Wilson. (N.T. 29). Dr. Chambers also did not review the court-ordered IMPACT drug/alcohol assessment of Mother or meet with anyone affiliated with the IMPACT Program, even though Mother's alleged abuse alcohol loomed as a significant part of this case, (N.T. 33). Instead, Dr. Chambers elected to take the time to conduct an interview of Mr. Santoro's ex-wife, Jessica Dobrushin, who, predictably, offered negative comments about Mother's household and Mr. Santoro. (N.T. 286-298). Indeed, much of the testimony and evidence relied upon by Dr. Chambers was later presented by Father in his case-in-chief. Further, as noted, I did not find the testimony of the tutor, Ms. Baker, to be very credible, particularly since the criticism about Mother which Ms. Baker made were unsupported by school records or any of A.H.'s teachers. Father also presented the testimony of his fiancé/wife, Ms. Passarell, and Ms. Dobrushin, the ex-wife. (N.T. 286-298, 301-328). While I did not find Father's testimony to lack overall credibility, I did find Father to be focused on re-hashing selected past issues that were not probative or predictive of either the current situation or what A.H. is likely to experience moving forward. While Father appropriately pointed out shortcomings in Mother's parenting style and household, those same problems were not bolstered by school records, records or reports from Allegheny County CYF, or Mother's court-ordered alcohol evaluation. It appeared to this Court that Father actively searched for issues that he could employ to use against Mother to aid him in his custody litigation. Sometimes, Father's allegations had no proof whatsoever, such as his repeated insistence that Mother's household contained "bed-bugs," an allegation that was never proved despite independent investigation by County CYF. (N.T. 204).

This Court found Mother to be credible and willing to take responsibility for many of the problems identified by Father during trial. Mother explained that she "would do whatever it takes to ensure that history does not repeat itself" (N.T. 429), and I found that sentiment and others like it to be generally authentic and persuasive. I was also persuaded by the testimony of Patricia Lozecki, the paternal grandmother of T.L., Mother's eldest daughter. (N.T. 386). Ms. Lozecki, a pediatric nurse anesthetist, testified to her almost 17-year relationship with Mother and about her direct knowledge of Mother's household. Ms. Lozecki provided what I found to be credible testimony about Mother's ability to parent in a blended family environment. She also offered

7

differing perspectives on some of the incidents raised by Father, including his allegations about the supposed pervasive "bed-bug" infestation. (N.T. 389-396).

Lastly, as to general issues of witness credibility, the most significant witnesses were A.H. (the at-issue Child) and her sister, T.L., whom I interviewed *en camera* after soliciting questions from the parties. A.H.'s testimony supported a 50-50 shared custody schedule. A.H. testified credibly and without taint of influence by either parent. My interview with A.H. left me convinced that she receives nurturing support in the care of Mother and Father, as well as appropriate educational support while in the custody of Mother. (N.T. 25-32). I conducted the interview with A.H. aware of Dr. Chambers' testimony that A.H. had expressed to him a preference to live with Father. That testimony was not supported by my interview, where no such preference was expressed. Of course, it is possible that A.H.'s perspective changed from the time of Dr. Chamber's evaluation and the time of trial, but there is of course no way to know that definitively. What this Court does know definitively from what A.H. said is that A.H. loves each parent and values her time with them while in their custody, and that she wishes that both could "get along" with one another. (N.T. 30-32).

The impressions reached by me after my interview with A.H. were bolstered by testimony of A.H.'s half-sibling, T.L., whom I found to be an accomplished and credible 17-year old. T.L. testified to a very active homelife in Mother's household. (N.T. 38). T.L. offered what I found to be credible explanation and context on some of the "alcohol related" incidents raised by Father, including one where Mr. Santoro allegedly kicked all the children out of the house. (N.T. 49-50). She also offered what I found to be valuable testimony in describing how A.H. relates to the ongoing conflict between Mother and Father and A.H.'s need to meet their respective expectations. (N.T. 49, 57-58, and 61).

Overall, through the course of a two-day trial, I listened to the testimony of more than a dozen witnesses, and I carefully deliberated over all the information that they imparted. I also reviewed each item of evidence presented to me. I allowed both sides largely to present their case without interruption. Everything that I did was to attempt to determine the best interests of A.H., keeping in mind that I was probably not seeing either party "on their best days" and that I was

8

receiving only select information about matters that occurred over many years. Having appropriately weighed and considered the evidence, I did not believe it mandated that I award Father Primary Physical Custody and Sole Legal Custody for purposes of educational decisions. Though Father disagrees with that conclusion, it was reached largely upon my credibility assessment of the evidence and witnesses before me. I did not make these decisions arbitrarily, capriciously, or out of ill-will or animus toward Father; indeed, I find Father to be an overwhelmingly positive factor in the Child's life, but not such that it supports removing the Child from Mother.

I have expounded on matters of credibility, because on issues of credibility and weight of the evidence, the Superior Court defers to "the findings of the trial judge who has had the opportunity to observe the proceedings and demeanor of the witnesses." *Billhime v. Billhime, 869 A.2d 1031, 1036 (Pa.Super.2005) (citation omitted)*. In this case, I found that Father largely sought to portray only his good qualities as a parent, while negatively portraying Mother and attempting to negate her real, valuable role in the Child's life which furthers the Child's development and well-being.

In the eight (8) paragraphs of his 1925(b) Statement, Father alleges that I failed to properly weigh and apply the statutory custody factors of 23 Pa. C.S. §5328 that were illumined by his evidence and testimony, as well as to give proper weight to the expert opinion of Dr. Chambers. I emphasized the factors which I found to be entitled to the most weight in this case. And I believed that I appropriately explained why I accorded some factors more weight than others within the context of the overall best interests of A.H. "It is within the trial court's purview as the finder of fact to determine which enumerated best interest factors are most salient and critical in each particular child custody case." *M.J.M. v. M.L.G., 63 A.3d 331, (Pa. Super.2013); app. den. 68 A.3d 909.*

## A. Allegation of Error #1 and #8: Weight and Testimony to Lay and Expert Witnesses

I interpret these allegations of error (numbers 1 and 8) as two sides of the same coin, each of which principally concern the weight I gave to the testimony of the various witnesses who

9

testified at trial. I state in my Memorandum Opinion that I did not find the testimony and evidence presented by Father to be of sufficient weight or credibility to support Father's proposed parenting plan and the relief he sought. The witnesses he presented did not establish that the best interests of A.H. would be advanced by her seeing less of Mother and more of Father, and that the status quo between the parties needed to be disturbed rather than improved upon through better communication and understanding. Doing so constituted an appropriate exercise of the discretion afforded to me to believe all, some, or none of the evidence presented. Accordingly, below is a synopsis of my impressions of each witness and their testimony, none of which supports the claims that Father made in this litigation.

- **Bruce Chambers, Ph.D. (N.T. 5-35).**

I found Dr. Chambers to be selective in his consideration and assessment of collateral sources, including his decision to interview the ex-wife of Thomas Santoro, but not A.H.'s therapist, teachers, or the parties' co-parent counselor. Dr. Chambers apparently made his own factual determinations of witnesses and evidence, which this Court did not, and does not have to, follow. This Court also found that Dr. Chambers did not offer appropriate explanation for what may reasonably be expected to occur if his parenting plan recommendations were adopted by this Court. Largely, I found that Dr. Chambers' testimony consisted more of factual gathering and evaluation than of real expert opinion, with much of those facts derived from testimony and witnesses that would be offered by Father in his case-in-chief. As was my right, I did not determine Dr. Chambers' testimony to be of sufficient weight to support Father's claims of custody.

- **Christian Bodo (N.T. 43-49)**

Ms. Bodo is one of A.H.'s teachers. Given that Father sought to receive Primary Legal Custody over educational decisions, I found Ms. Bodo's testimony for to be noteworthy for what she did not say. Ms. Bodo, as a teacher at A.H.'s school, can see and interact with A.H. on a daily basis in her school environment. This stands in stark contrast to that of the tutor, Ms. Baker (N.T. 52-59), who only encounters A.H. on a weekly basis, after school has concluded, and while A.H. is in the custody of Father. Ms. Bodo did not echo any of the shortcomings of Mother which the tutor eagerly testified about at length. Indeed, there were no records or reports from the school that supported Father's claims or that negatively reflected upon Mother's role in A.H.'s education. Both parents testified to A.H. having some special requirements that are being met through an

implemented IEP program by the school. According to Ms. Bodo, Mom is involved in that program, has attended necessary meetings and is an involved parent. (N.T. 50). Overall, Ms. Bodo spoke of A.H. being an average student about whom Ms. Bodo does not have any concerns. (N.T. 49). Certainly, to my mind, to support removing Mother from educational decision making, I would have expected to have seen evidence or heard testimony from A.H.'s school identifying specific concerns. Instead, I only heard those matters raised by a tutor who is paid by Father, obviously dislikes Mother personally, and enjoys limited interaction with A.H. Thus, in terms of my ruling on legal custody, I weighed evidence (and its absence) from A.H.'s school more heavily than that from Father and the tutor.

- **Adrienne Baker (N.T. 52-96)**

Ms. Baker acts as A.H.'s tutor. It is no hyperbole to suggest that Father predicated his legal custody claims largely upon the testimony of Ms. Baker, who to this Court's impression has inserted herself in the volatile dynamics of this family to a degree unexpected of a tutor who, at most, interacts with A.H. once per week. (N.T. 90-101). Ms. Baker testified to Father being heavily involved and invested in A.H.'s academic pursuits, a view this Court has no reason to doubt. However, since A.H. does not attend sessions while in Mother's custody and Ms. Baker does not communicate with Mother about A.H., Ms. Baker truly has limited insight into what occurs within Mother's household or how what happens there impacts A.H. during the school-day. (N.T. 90-111). As Mother effectively pointed out during her cross-examination of Ms. Baker, meetings and communications have occurred between and among teachers, guidance counselors and school psychologists that have identified and discussed A.H.'s issues, which do not include Ms. Baker as the Child's tutor. (N.T. 111-125). It appeared to me that Ms. Baker sought to focus on issues that were not identified as problems by the school. (N.T. 111). And I believe that it would have been quite unreasonable of me to give more weight to the views and opinions of a Child's tutor than those persons at the school who are specifically involved with the Child's education on a daily basis. Indeed, during the summer months, Ms. Baker does not even see A.H. weekly. Thus, I found Ms. Baker and the other testimony elicited by Father to be a thin reed upon which to premise a switch of Legal Custody on such an important, essential parental prerogative as education/academic matters. In addition, beyond purely academic matters, Ms. Baker also testified to various issues and incidents about which A.H. told her that negatively reflect upon Mother and her household environment. Apart from the fact that I found it to be curious for a tutor

11

to devote limited tutoring time to reviewing A.H.'s life with her Mother, much of what Ms. Baker testified to in this regard echoed the testimony of Father, Dr. Chambers and Father's other witnesses, and as noted herein and in my Memorandum Opinion, I found the issues/incidents raised by Ms. Baker to have been appropriately addressed by Mother and her witnesses, as well as in my interview with A.H. and T.L.

- **Louis Hayes/Father (N.T. 130-280)**

I found Mr. Hayes to have been a credible witness in many respects who obviously has the best interests of his daughter at heart. It is clear to me that Mr. Hayes regards himself as the superior parent to Mother, and, perhaps, if we kept a score-card this would be true. Certainly, throughout the trial, more discussion was had concerning incidents involving Mother than Father. To this end, Father identified several incidents that involved Mother and allegations of significant alcohol use where Father had to be called to pick-up A.H. (N.T. 135-139, 153, 157). Father recounted between "5 and 8" such pick-ups in 2022. However, even if I were to accept all of Father's allegations as true, without any countervailing explanation or context from Mother, the incidents to which Father testified do not support removing custody from Mother. Instead, what I conclude they do support is that Mother and Father must have better, more open communication, and Mother should allow Father to routinely exercise the "right-of-first-refusal" set forth in their custody agreement. Certainly, Father displays a different parenting style than Mother and has different priorities, particularly when it comes to how A.H. approaches her academics. Nevertheless, Father did not offer much testimony, if any, as to how Father's proposed custody schedule would ameliorate any issues with A.H. or impact her relationship between her, her siblings and her Mother. (N.T. 213-256). Unfortunately, the parties' protracted litigation posture has exacerbated their problems between each other. Father seems to have attempted to collect evidence against Mother to be used in this custody proceeding. Some of that evidence, as noted, has been credible, but other allegations have not been. For example, Father complained about A.H. suffering from "bed-bug" bites while in Mother's custody. (N.T. 250-256). Father filed multiple court motions on this issue. CYF was called to home. The "bed-bugs" were never confirmed by CYF, or by any doctor or other person. (N.T. 255). Thus, while Mother's own conduct has certainly caused some issues, in other respects Father has been the protagonist. Therefore, based upon Father's testimony, I did not conclude there to be a sufficient basis to suggest that switching custody would be in the best interest of A.H.

12

- **Jessica Dobrushin (N.T. 286-298)**

Ms. Dobrushin is the ex-wife of Mother's current husband, Thomas Santoro. Ms. Dobrushin and Mr. Santoro admit to having an awful co-parenting relationship. Accordingly, I did not ascribe much weight to her testimony given the inherent bias of her perspective. Ms. Dobrushin did testify to an incident involving Mother where Mother and Ms. Dobrushin went out to celebrate a birthday, which ultimately resulted in Mother becoming significantly inebriated. While I found this testimony to negatively reflect upon Mother, I did not conclude that the incident recounted by Ms. Dobrushin justified, alone, switching custody. As noted, Mother directly spoke about this incident in her testimony in what I determined to be a credible and straightforward fashion. Overall, within the context of this case, I did not find Ms. Dobrushin's testimony to be very consequential – though, curiously, Dr. Chambers decided to interview her as opposed to the several other individuals suggested to him by Mother.

- **Emily Passarell (N.T. 301-328)**

Ms. Passarell is the current wife of Father. I found her testimony to be credible, though of limited applicability, as it essentially echoed the incidents and issues highlighted by Father throughout his testimony, particularly as to the incidents involving Mother where he was called to pick up A.H.

- **Matthew Ansani (N.T. 339-352)**

Mr. Ansani is an adult, male friend of Mother's and Mr. Santoro who can often be found at Mother's household, sometimes spending overnights. Certain of Father's allegations concerned Mr. Ansani and that A.H. feels uncomfortable around him when he is present. Because of his relationship with Mother and obvious bias, I did not ascribe much weight to the testimony of Mr. Ansani. However, I did not find the allegations directed at Mr. Ansani to have been established such that I determined Mother's interactions with Mr. Ansani and his presence in the home to be contrary to the best interests of A.H.

- **Dawn Dancy (N.T. 354-363)**

Ms. Dancy is the sister of Mother. Ms. Dancy testified to an incident involving A.H. sleeping-over at her home with A.H.'s cousins, during which A.H. texted Father to come pick her up because A.H. did not want to be there any longer. Ms. Dancy's testimony offered some insight as to why, perhaps, on certain occasions, A.H. may ask for her Father to get her while she is in

13

Mother's custody. However, overall, Ms. Dancy's testimony proved to be of limited probative value.

- **Thomas Santoro (N.T. 364-384)**

Mr. Santoro is Mother's current husband and the step-father of A.H. Objectively, the household of Mr. Santoro and Mother is much more complicated than that of Father. However, I also found that Mr. Santoro presented credible testimony as to his relationship with Mother and the children: a married couple, with a blended family, subject to challenging demands upon them. "I do not think we fight a lot. At the end of the day, we love each other very much, I would say that it is a typical marriage, that's going to have its ups and downs." (N.T. 376-380). Assessing the totality of Mr. Santoro's testimony within the context of the issues presented, I did not find there to be any reasons offered to support the reduction of A.H.'s custody time within the household.

- **Patricia Lozecki (N.T. 386-405)**

I found the testimony of Ms. Lozecki to be credible and persuasive. As the paternal grandmother of T.L., Ms. Lozecki testified to her frequent observations of Mother, her parenting style, and her household. Ms. Lozecki testified to having no reservations about Mother's capacity to care for her children, including A.H. I am cognizant, of course, that Ms. Lozecki, as is the case with Father's witnesses, cannot know what occurs within the four walls of Mother's household on a daily basis. However, within those restrictions, Ms. Lozecki presented herself as an active, involved grandparent who enjoys a close relationship with T.L., Mother's eldest daughter who lives with Mother. This Court does not believe Ms. Lozecki would sit idly by if she had any basis to believe that Mother could not capably parent or if circumstances existed within her household that presented risks of harm to her children. Instead, Ms. Lozecki testified to having an ongoing, positive relationship with Mother throughout the seventeen years of T.L.'s life, even though Mother and the father of T.L. (Ms. Lozecki's son) never married. Perhaps Ms. Lozecki's testimony would not be weighty enough to grant someone expanded custody time. However, to this Court's view, it more than adequately responded to several of the concerns raised by Father and corroborated Mother's presentation of the evidence and explanation of the facts.

- **Alana Santoro/Mother (N.T. 408-473)**

Mother testified to her different parenting approach from Father. (N.T. 434). She sought to explain how she assists A.H. with her school-work, noting the times that A.H. achieved the

14

"Honor Roll." Mother admitted to the incident involving her drinking with Ms. Dobrushin. (N.T. 429). She also sought to explain with seeming credibility other times when Father arrived to pick up A.H. from her custody. (N.T. 474). This Court credits what appears to be her genuine regret about the incident, and her assurance that something like it would not happen again. Mother also testified as to how she subjectively feels as if she and her family have been placed under a microscope, such that she needs to be on guard against Father's attempts to use anything that occurs to his benefit in the custody litigation. (N.T. 429-434). I thought, too, that Mother credibly testified to her difficulty in co-parenting with Father, particularly during times where they are both physically present (N.T. 437). Mother also addressed allegations concerning her alcohol use, noting that she has followed the court-ordered IMPACT recommendation and has been evaluated with respect to any alcohol or drug abuse issues. (N.T. 471-492). In conjunction with the other evidence and testimony over the course of two days, I found Mother's testimony to be generally credible and supportive of maintaining the status quo. That certainly is not to minimize or explain away Mother's responsibility for some of the dysfunction that has occurred. The parties desperately need to undergo meaningful co-parenting therapy, which I addressed in another Order. However, I do believe it serves to undergird my conclusion that prohibiting Mother from being involved in A.H.'s school decisions and causing A.H. to see less of Mother is not in A.H.'s best interests in either the near or long terms.

- **David Lozecki (N.T. 460-462)**

Mr. Lozecki is the natural father of T.L. Mr. Lozecki's testimony did not weigh heavily in my decision. Mother sought his testimony for the proposition that Mr. Lozecki has been able to effectively co-parent with Mother for an extended period of time without any of the issues arising that have been voiced by Father in this case.

- **A.H. (N.T. 1-38)**

I found A.H. to be a credible, truthful witness who has close relationships with both sides of her family. A.H. did note concern about her Mother drinking alcohol. (N.T. 14-18). However, when I delved further into A.H.'s preferences, she expressed to me her desire to spend time with both parents and that she feels good with both Mother and Father. (N.T. 30-32). I did not find the testimony of A.H. to support Father's claim of Primary Custody nor did it buttress Father's claim to exercise Sole Legal Custody over educational matters. And, though given the opportunity to do

15

so, A.H. did not express any preference to live with either parent as related to the Court by Dr. Chambers.

- **T.L. (N.T. 38-61)**

I determined T.L. to be a credible witness who did not show a bias toward either party. Indeed, she spoke approvingly of Father's love for A.H. (N.T. 55). She also related valuable context to several of the issues raised by Father in terms of incident involving Mother that required Father to retrieve A.H. during Mother's custody time. (N.T. 46-52). Her testimony underscored the difficulty encountered by A.H. as a 12-year old navigating the expectations of her parents and the evolving dynamic of a blended family with two younger siblings, all while her parents are actively and acrimoniously involved in custody litigation. Though far from definitive on the questions that needed to be addressed, T.L.'s testimony provided helpful insight as to whether A.H. would be best served by having Mother play a more limited role in her life.

I reviewed the testimony and evidence offered by each of the above witnesses, carefully considering and weighing how what they presented fit into each of the enumerated custody factors. Employing the discretion afforded to me to assess credibility, I appropriately determined that Father should not be awarded Primary Physical Custody and Sole Legal Custody for purposes of education. In so doing, I did not commit any legal error or abuse of discretion.

## B. Allegation of Error #2: Custody Factor #10: The Party Most Likely to Attend to the Daily Emotion Needs of the Child

Ultimately, I determined this enumerated Custody Factor (#10) to be "neutral" based upon the evidence and testimony presented to me. However, even were I to have found this Custody Factor to have favored Father, I did not accord this Factor, alone, with sufficient weight that it would have altered my ruling. As to which parent is "more likely to attend to the .... daily needs of the Child," I concluded, appropriately, that both parents do this, can do so and are likely to serve this role in the future. Looked at another way, Father did not persuade me with sufficient credible evidence that any needs of A.H. are currently going **unmet** while in Mother's care and custody. Each parent demonstrates a decidedly different parenting style. Each parent has a household with different dynamics. Father presented evidence of selected instances where he alleges Mother

16

abandoned A.H. to pursue her own social activities. Father sought to use those instances to demonstrate a pattern by Mother of failing to meet A.H.'s daily needs. I did not find the evidence to be sufficiently credible or persuasive in this regard. Nor do I find that Father offered enough evidence to support the proposition that the best interests of A.H. are furthered by seeing less of Mother and spending more time with Father. Both parents have their pluses and minuses. Both are capable to meet the needs of A.H. Neither during trial nor during my review of the record in the preparation of this Opinion did I identify facts showing that Mother is deficient in meeting the daily requirements of A.H. Accordingly, I did not err in finding this Factor to be "neutral" as between the parties.

C. <u>Allegation of Error #3: Custody Factor #9: Loving, Stable and Nurturing Relationships</u>

Based upon my review of the evidence, I concluded this Custody Factor to be "neutral" as between the parties. I did not find that Father offered credible evidence from which I could conclude that Mother was <u>not</u> loving, stable, nurturing or the like, or that Father was more so in any of these regards. I particularly relied upon the testimony of Mother, of Ms. Lozecki, of A.H., and of T.L. Additionally, as noted, I did not find Father's evidence and testimony to possess sufficient credibility to prevail on this factor, which is within my province and discretion. As to this Factor, I believe both Mother and Father are loving, stable, and nurturing people – albeit in different ways, in different family dynamics. Obviously, to my mind, the "stability" which Mother offers is going to be viewed differently within a household that has multiple siblings, both younger and older. But, quantifiably, these differences are not of sufficient tangibility and depth to mandate a finding for Father. I did not find evidence suggesting that Father demonstrates more of these qualities than Mother. That there have been times when, for whatever reason Father has picked up A.H. during Mother's custody time does not equate to a finding favorable to Father on the totality of the evidence. It should also be emphasized that I did not predicate my ruling and order upon a "neutral" finding for this Custody Factor. Rather, I anchored my decision on the totality of the evidence presented, being mindful of the best interests of A.H. moving forward. On that note, I did not discern sufficient evidence to alter the status quo for this child. Instead, I think it is imperative that both parents put aside their differences and strive to improve upon the status quo that does prevail.

**D. Allegation of Error #4: the Level of Conflict Between the Parties: Custody Factor #13**

The level of conflict between the parties is pervasive and chronic. Their lives have seemingly been swallowed up by this custody litigation over the past three (3) years, with both parties seemingly wishing to live under a microscope and have each one of their parental decisions second-guessed and rehashed in an uncomplimentary fashion. I found the level of conflict between the parties to be "neutral" for the singular reason that I strongly believe that the evidence shows both parties to be responsible for the level of conflict. On one hand, Mother stubbornly refused to follow the "right of first refusal" language in the parties' custody order, leading to conflict with Father. On the other hand, Father made repeat, unsubstantiate allegations about "bed-bugs." Mr. Santoro verbally engaged with Father at one of A.H.'s basketball events. Father retains and pays a tutor who does not speak to Mother and with whom she does not get along. Both parties are in co-parent therapy. Father credibly testified to his difficulty in getting along with Mother. Mother also credibly testified that she has difficulty with Father. Viewed objectively, that the level of conflict is attributable to the conduct of both parties has been proved beyond a reasonable doubt. That the level of conflict could be conceivably a factor "favoring" Father is simply incredible from the testimony that I heard. Again, certain parties are more responsible for the lack of resolution on certain issues, but, overall, both Mother and Father are both to blame and occupy equal levels of culpability. Additionally, I believe that Mother testified credibly that she wishes to improve the parties' level of conflict and that she stands wiling to engage in further co-parenting therapy. In this respect, one can point to Mother's relationship of co-parenting with T.L's father over the course of 17-years. I do not, and did not, view the evidence as showing that Mother is ideologically committed to engaging in conflict or that she is the party that always wishes to continue the dispute. To the contrary, Father, at trial, continued to allege an infestation of "bed bugs" in the absence of any evidence. This is but a picayune example, but one that does illustrate that there does exist "sufficient blame to go around" under this Custody Factor.

## E. Allegation of Error #5: Determination that the Quality of the Child's Life Would Not Be Enhanced if Father Exercised Primary Custody

The record shows that I did not commit any reversible error by failing to conclude that the Child's life would not be enhanced by giving Father Primary Custody and implementing his proposed parenting plan. As I have already noted, I perceived there to be vacuum of credible evidence offered by Father and his witnesses as to how the life of the Child would be beneficially impacted by reducing the time she spent with Mother and in Mother's household. Instead, I appropriately found that the Child's life is enhanced by spending time with both parents and continuing to foster the close relationship between the Child and her siblings, particularly as she moves into her teenage years. Simply put, Father did not come forward with sufficient evidence to show that additional days during the week at his house would substantially benefit Child. I reached this conclusion based upon the totality of the evidence, including my judicial interview of A.H. The parties live near one another. Reducing Mother's time with A.H. will not, in my view, reduce the level of conflict between the parties or resolve any of the ongoing issues between Mother and Father, especially since A.H. would still reside in Mother's household throughout the week, remaining subject to the negative influences which Father contends exist there. What I suppose would be altered is the dynamic between A.H. and Mother concerning homework, an issue that is largely predicated upon the testimony of the tutor, Ms. Baker, which I found to be not very credible and biased toward Mother. Removing A.H. from Mother's custody during the school week would disrupt A.H.'s network of friends that she has around Mother's home, but most importantly would also disrupt her relationship with her siblings, both older and younger. On this point, neither Father nor Dr. Chambers offered credible testimony as to how A.H. would deal with and interpret this disruption and reduction. A.H. did not tell me, either, that she wished to spend less time with her Mother and her other siblings. Therefore, for all of the reasons that I discussed in my Memorandum Opinion and Order, I appropriately concluded that A.H.'s best interests were not going to be furthered by altering the status quo and giving Father enhanced custodial time. The record does not support my reversal on this issue.

19

## F. Allegation of Error No. 6: Custody Factor # 14: Drug and Alcohol Use

Next, Father contends that I erred by failing to find in his favor on Custody Factor # 14 involving drug and alcohol use between the parties. Certainly, alcohol use was an issue during the trial. Father alleged that he has had, on multiple occasions, been required to retrieve A.H. from Mother's custody because Mother was inebriated and unable to care for A.H. Father has consistently alleged that Mother prioritizes her social life over A.H. Father cites the use of alcohol within the household, particularly by Mr. Santoro and his friends to be a disruptive source of conflict. During my interview, A.H. told me that she is concerned that her Mother drinks alcohol and that Mother "hangs out" downstairs of their house where the bar area is located.

Allegations of inappropriate use of alcohol are serious. However, I did not find a pattern of behavior that supported me to make a conclusion adverse to Mother based on the incidents that Father presented. To be sure, Mother admitted to one instance where she drank alcohol to excess, leading to a conflict with Mr. Santoro that led Father to conclude that Mr. Santoro "kicked the children out" of the house. But, as to that incident, Mother was not caring for A.H., and had planned for a "night out" to celebrate a birthday. I did not find any other credible evidence to suggest that Mother is imbibing alcohol while caring for A.H. or that her use of alcohol impacts her ability to meet the needs of A.H.

In concluding thusly, I reviewed and noted Mother's successful compliance with all court-ordered programs (the IMPACT Program) and interventions to address allegations of alcohol which had been raised at other stages of this litigation. I had before me no credible evidence of Mother's abuse of alcohol or drugs. I had no reason to, as a practical matter, question and/or overrule the determination of the court-ordered evaluator in the IMPACT Program who considered the issue of alcohol. Father made Mother's alcohol use a part of this case yet did not produce sufficient evidence at time of trial. Rather, Father predicated his claims upon innuendo and inference. Also, just because A.H. is concerned about Mother drinking alcohol does not, *ipso facto*, mean that Mother is inappropriately using alcohol. I believe Mother credibly and appropriately explained her alcohol usage during trial, and I have no reason to conclude that Mother was not being forthright or that the court-ordered program and evaluation in which Mother participated reached an erroneous conclusion. Furthermore, with respect to the alcohol use issue,

20

the Court found Mother's witnesses, namely her daughter T.L. (age 17) and Ms. Lozecki (Taylor's Maternal Grandmother), to present effective rebuttal testimony in this regard.

Father also reported issues with Mr. Santoro using alcohol to excess. Mr. Santoro, during his testimony certainly reported to being a social drinker and having alcohol when he comes home from work. In so doing, Mr. Santoro is not violating any court order. Nor did it appear to me from the credible evidence presented that the usage of alcohol by Mr. Santoro is a factor that normally, routinely, or regularly impacts A.H. On this issue, I point to the testimony of Ms. Dobrushin, Mr. Santoro's ex-wife. It is no hyperbole to say that Ms. Dobrushin and Mr. Santoro do not like one another: her distaste for him was readily apparent when she spoke his name – and vice versa – yet Ms. Dobrushin allows her son to spend overnights with Mr. Santoro in his care and custody, which I would not expect to occur if she harbored legitimate concerns over his chronic alcohol use.

Therefore, for all the above reasons, but especially because of the lack of tangible, credible evidence, I appropriately determined this factor to be "neutral," and it should in no way serve as a basis to overrule my carefully crafted decision in this case.

## G. Allegation of Error No. 7: Failure to Follow the Recommendations of Dr. Chambers

I am not required to adopt or credit the testimony of an expert simply because they are an expert or because they have been court-appointed to offer an opinion in a custody litigation. In my Memorandum Opinion and Order and throughout this Opinion, I have identified the significant shortcomings which I found in the testimony of Dr. Chambers.

First, I found Dr. Chambers' testimony to be generally unhelpful and non-illuminating because Dr. Chambers declined to testify about the impact that the implementation of his proposed parenting plan would have upon A.H. Instead, Dr. Chambers largely focused upon past events which he viewed in a light favorable to Father. In so doing, I found Dr. Chambers to have taken on a role of marshalling and evaluating all the facts presented to him by Father, thus resulting in testimony that basically served as an attenuated summary of Father's case-in-chief. Dr. Chambers' opinion as to A.H. was not buttressed or undergirded by any especial analysis of children, their psychology, their mental health, or their thought processes upon being confronted with changed

21

circumstances in a family dynamic. Simply put, Dr. Chambers seemed to offer an "opinion," but omitted the "expert" portion of it. To this end, I believe it is noteworthy that Dr. Chambers did not testify to having any clinical practice involving children. From Dr. Chambers' curriculum vitae and his testimony, I gleaned that Dr. Chambers has served as a full-time expert witness for the better part of two decades. And, while I certainly do not chide Dr. Chambers for providing this service to the court system, for me to have adopted Dr. Chambers' recommendations in the life of this Child, to have disturbed the status quo and disrupted her sibling relationships and family dynamic, I required better, more qualified professional guidance than what I ultimately received from Dr. Chambers.

Second, I concluded that Dr. Chambers selectively used information provided to him by Father that was favorable toward Father's case and Father's version of the facts. Dr. Chambers interviewed A.H.'s tutor and Mr. Santoro's ex-wife. Yet, Dr. Chambers neglected to interview the Child's therapist. Before making recommendations that would so significantly impact the life and well-being of any child, I would have expected any evaluator to have made it a priority to interview that child's therapist or to, at minimum, review applicable records. That Dr. Chambers prioritized the tutor and the ex-wife reflects negatively upon Dr. Chambers to both his credibility and the overall weight his testimony should receive. Mother effectively cross-examined Dr. Chambers on these points (N.T. 29-33), enumerating the several persons whom she asked Dr. Chambers to contact. Dr. Chambers failed to give a credible explanation as to why he contacted and interviewed some people, but not others, such as A.H.'s therapist, the parties' co-parent counselor, and the court-ordered alcohol evaluator through the IMPACT Program. Curiously, the persons whom Dr. Chambers did contact were the same persons whom Father presented as witnesses during Father's case-in-chief.

Therefore, for these reasons, I appropriately disregarded the opinion of Dr. Chambers, finding it to be of scant probative value to guide my determination of the best interests of A.H. In so doing, I followed the law, exercised my discretion, and reached my conclusion following a careful determination of his testimony. Accordingly, my refusal to be guided by the opinion of Dr. Chambers cannot constitute reversible error.

## CONCLUSION

As I stated above, and as I also discussed in the courtroom and in my Order, I found both parties to be competent, loving parents who care deeply for A.H. In this case, I had to choose whether to reduce the time A.H. spent with Mother and prevent Mother from participating in educational decision. On balance, I found that it was in A.H.'s best interest to maintain the status quo and to allow her to live with both parents on an equal footing so that she can benefit from relationships with her siblings on both sides, her extended friends and family, and the different parenting styles exhibited by the parties. Because of an absence of credible evidence, I could not follow the recommendations of the court-appointed expert nor could I adopt Father's proposed parenting plan. That I did not rule in Father's favor is not due to an error of law or an abuse of discretion. I carefully analyzed this case in light of the relevant statutory factors and because my December 27, 2023 Custody Order is supported by the evidence and serves the best interests of A.H., it should be affirmed.

BY THE COURT:

_____, J.